IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Benjamin R. Picker,                          :
                         Petitioner          :
                                             :
         v.                                  :  No.  553 C.D. 2024
                                             :  Argued:  December 9, 2024
Pennsylvania Liquor Control Board            :
(Office of Open Records),                    :
                         Respondent          :


BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE STACY WALLACE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                          FILED:  January 8, 2025


        Benjamin R. Picker (Requester) petitions for review of the April 24, 2024
Final Determination of the Pennsylvania Office of Open Records (OOR), which
denied his appeal from the January 22, 2024 decision of the Pennsylvania Liquor
Control Board (PLCB) denying his Right-to-Know Law[1] (RTKL) request (Request).
The PLCB, meanwhile, challenges the OOR's conclusion the Request was
sufficiently specific.[2]  In addition, Requester's Interim Application for Counsel Fees

---

[1]  Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.
[2]  The PLCB did not file a cross appeal in this matter.  Nevertheless, as the prevailing party before
the OOR, the PLCB was not required to file a cross appeal to challenge the OOR's determinations
against the PLCB.  *See* Note to Pennsylvania Rule of Appellate Procedure 511, Pa.R.A.P. 511
(stating "an appellee should not be required to file a cross appeal because the court below ruled
against it on an issue, as long as the judgment granted appellee the relief it sought").  As a result,
we will consider the PLCB's claim as properly preserved by virtue of the PLCB's inclusion of the
claim in its brief.

(Application), asserting the PLCB engaged in vexatious conduct by including materials not contained in the certified record[3] in its brief to this Court, is pending before this Court. Upon careful review, we reverse the OOR's Final Determination, direct the PLCB to produce the requested records, and deny Requester's Application.

## I.    Background

On December 14, 2023, Requester submitted the Request to the PLCB seeking the following:

> Documents containing the dates that each PLCB Fine Wine & Good [Spirits] [(FW&GS)] store in Montgomery, Delaware, Chester, and Bucks Count[ies] received deliveries of bourbon whiskey during the year 2023 and which bourbon whiskeys were delivered to each such store on each such date.

Reproduced Record (R.R.) at 24a.[4]  Because the PLCB did not issue a timely response, the OOR deemed the Request denied under Section 902(b)(2) of the RTKL, 65 P.S. § 67.902(b)(2). *See* R.R. at 256a. Nevertheless, one day after its response deadline had passed, the PLCB emailed Requester a decision denying the Request under various exemptions to the RTKL. *Id.* at 17a-19a.

Requester filed an appeal to the OOR on January 23, 2024. The PLCB argued before the OOR that the Request was insufficiently specific and that the responsive records were exempt from disclosure under Section 708(b)(1), (3), and (11) of the RTKL, 65 P.S. § 67.708(b)(1), (3), (11). In support, the PLCB submitted sworn attestations of Angela Schaul (Schaul Attestation) and Martin Molitoris (Molitoris

---

[3]  By Order dated October 21, 2024, this Court granted Requestor's Application to Strike Exhibits B through H of the PLCB's Brief, as well as any references in the PLCB's Brief to those Exhibits, because they were not part of the record on appeal.

[4]  Requester made a second request for records on December 14, 2023; however, he withdrew this request on December 15, 2023. R.R. at 20a-21a. The OOR did not address this second request, nor has Requester asked this Court to do so. Accordingly, all references in this opinion to the Request include only Requester's single, preserved request.

Attestation) (collectively, the Attestations).  *See* R.R. at 104a-06a, 229a-31a.

Relevantly, the Schaul Attestation states:

> 1. I am the Director of Store Operations for the [PLCB]. I have held this position since November 4, 2019, and I have worked for the PLCB as a permanent, full-time employee since that time. I am authorized to provide this [attestation] on behalf of the PLCB.
>
> . . . .
>
> 3. As the Director of the Bureau of Store Operations, I am responsible for the strategic planning, policy development, and operation and support of all [FW&GS] stores located throughout Pennsylvania.  I also serve as the primary administrator providing guidance, leadership, and vision for retail operations within the PLCB, oversee and direct property management, store personnel, customer service, sales policies, inventory control, and merchandising displays, plan and oversee the implementation and monitoring of retailing, wholesaling, and in-store storage of all wine and spirits sold in FW&GS stores, direct subordinates responsible for implementing policies and procedures, and meet with public and private organizations, industry representatives, vendors and licensees, government officials, and the public to interpret, clarify, or promote [PLCB] policies.
>
> 4. I am also responsible for directing and overseeing the activities of three Regional Managers in Philadelphia, Harrisburg, and Pittsburgh. These three Regional Managers represent the highest level of field supervisor personnel for the PLCB's FW&GS stores. I supervise staff who perform administrative duties in support of regional operations. Further, I plan and direct the retailing, wholesaling, and in-store management of all wine and spirits inventories through the store system; and oversee, in conjunction with the Regional Managers, the design and maintenance of stores to ensure the stores are maintained properly, among other duties.
>
> 5. In my position, I am also made aware of many different issues regarding activity at the FW&GS stores. This includes any issues with customers, product, and employees.
>
> 6. I am aware of several groups on social media consisting of overzealous fans of bourbon whiskey ("bourbon whiskey customers").

These groups of people spend their time tracking and pursuing shipments of bourbon whiskey around the state.

7. These groups have caused many issues in our stores including, but not limited to, harassing staff, harassing customers, and harassing delivery drivers.

8. For example, in FW&GS Store 1007, there have been instances where groups of people have brought lawn chairs to camp out at the stores waiting on shipments of bourbon whiskey. They will loiter for hours, and this disrupts the shopping experience for other customers and puts an added burden on store employees.

9. I have personal knowledge of FW&GS stores being inundated with phone calls and e-mails when customers find out through these social media groups that products have been delivered or will be delivered to a particular store. This has occurred at FW&GS [S]tores 0934, 5185, and 6717. When this happens, it can cause difficulty for the employees and other customers.

10. I have personal knowledge of an employee being verbally attacked on the phone by a customer at [S]tore 5185. This incident escalated to the employee being named and publicly ridiculed online.

11. I have personal knowledge of these bourbon whiskey customers causing issues for other customers in the store including issues with occupancy rules, loitering, and buying out products before others can buy them at FW&GS Stores 3901, 6717, and 1007.

12. I have personal knowledge that at least ten people wait outside FW&GS Store 0247 every day before store opening in order to be the first to purchase allocated products.

13. I have personal knowledge that there are bourbon whiskey customers at FW&GS Store 1007 who purchase bourbon whiskey product to sell on the secondary market both online and in Ohio.

14. Often, the bourbon whiskey customers learn of the delivery routes. I know of an instance where one such customer chased a FedEx truck and was able to get into the truck to confront the driver about the shipments of bourbon whiskey.

4

15. In December 2023, I was visiting FW&GS Store 1007 to meet with the regional and district managers. When I arrived, the store was not yet open but there was a line of thirty people outside. According to the employees at the store, the line was made up of bourbon whiskey customers who had learned that a shipment came in and were waiting for hours for the shipment to be unloaded. These bourbon whiskey customers can be very unpleasant for both other customers and employees as they are waiting impatiently for the product to be unloaded and put on the shelves.

16. Based upon these incidents and other ones just like them, I have a genuine fear for the employees of both the PLCB and third-party companies working on our behalf due to these bourbon whiskey customers. Additionally, I know that these bourbon whiskey customers can make it unpleasant for other customers to shop in the store.

17. Although the PLCB has taken steps to try to discourage these bourbon whiskey customers from pursuing these shipments, they are always coming up with new ways to identify these shipments and pursue them.

R.R. at 229a-31a. The Molitoris Attestation provides:

1. I am the Director of Asset Protection for the [PLCB]. I am authorized to provide this affidavit on behalf of the PLCB.

2. I have served as the Director of Asset Protection since October 10, 2022.

. . . .

4. It is my responsibility to ensure that all PLCB [FW&GS] stores are properly monitored in terms of physical security, that inventory is properly accounted for, and that our staff and our customers are able to enjoy a safe environment to work and shop in.

. . . .

6. Providing any information regarding sensitive logistics data would significantly increase the risk of harm to our personnel and business partners, as an actor of a crime would know exactly where and how to plan and/or intercept specific shipments to gain access to product in

5

route to store locations. This would pose a serious threat to parties involved in the transport, and receipt of product as without warning actors could interfere in the process which could easily escalate to violence.

7. Data from article ----https://levittownnow.com/2023/02/27 /bourbonconnoisseurs-spirits-run-high-then-low-as-pa-other-states-allot-rare-bottles/

> *"It's really crazy. People are climbing into delivery trucks to look around, stalking clerks, sneaking into storerooms. Sometimes they will line up before opening just to be the first to ask if there's anything new," said Shawn Kelly, press secretary for the [PLCB]. "We want to give the average Pennsylvanian the opportunity to buy a once-in-a-lifetime bottle. We don't jack up the price, and we don't make it hard to find."*
>
> *Like many of its peers among the "control states" that run their own liquor stores or wholesalers, Pennsylvania has been experimenting with new distribution methods. State-run stores often will shift to online purchasing or lottery sales for particular bottles when the hunt gets too feverish, Kelly said.*

8. With the increase in assaults taking place in stores, I am concerned that providing logistics and product information would place our store employees at an even greater risk of harm from the public.

9. Last year, the New York Times reported on the rise in assaults that is taking place in stores throughout the country. The article cited statistics from the FBI for the period from 2018 to 2020, which found that . . . assaults overall rose 42%, but assaults in grocery stores rose 63% and assaults in convenience stores rose 75%.

l0. Allowing this information to become public would significantly increase the store's vulnerability to theft and also define where specific quantities of alcohol are present in PLCB locations.

R.R. at 104a-05a (italics in original, footnote omitted).

The OOR denied Requester's appeal, concluding the Request is sufficiently specific, but the PLCB established through the Attestations that the responsive

records are exempt from disclosure under Section 708(b)(1)(ii) of the RTKL, 65 P.S. § 67.708(b)(1)(ii), which is commonly known as the personal safety exemption. *See* R.R. at 255a-67a. Because the OOR determined the responsive records were exempt from disclosure under the personal safety exemption, the OOR did not address the PLCB's additional claimed exemptions. *See id.* at 266a. Requester filed a petition for review in this Court on May 7, 2024, seeking a reversal of the OOR's Final Determination.

## II.     Issues

Requester raises the following issues for our review: (1) whether the OOR erred in determining the PLCB sustained its burden of proving the requested records should be exempt from disclosure under the personal safety exemption; and (2) if the OOR did err, whether the PLCB also failed to sustain its burden of proving the requested records should be exempt from disclosure under the PLCB's additional argued grounds for exemption.[5] The PLCB raises one additional issue for our review: whether the OOR erred in determining the Request was sufficiently specific.

## III.     Analysis

We recently summarized our scope and standard of review in RTKL appeals from decisions of Commonwealth agencies[6] as follows:

> Pursuant to Chapter 13 of the RTKL, with respect to appeals relating to decisions of Commonwealth agencies, this Court is the ultimate factfinder in RTKL disputes. Section 1301 of the RTKL, 65 P.S. § 67.1301. Accordingly, we owe no deference to the OOR's legal analysis or factfinding, as our standard of review of a final determination of the OOR is de novo. *Bowling v. Off. of Open Recs.*, 75 A.3d 453, 474 ([Pa.] 2013). In addition, we are "entitled to the broadest scope of review[,]" covering all justiciable issues raised and

---

[5]   We have rephrased and reframed Requester's issues on appeal for clarity and ease of analysis.
[6]   As an aside, in RTKL appeals from decisions of local agencies, Courts of Common Pleas, not this Court, serve as the ultimate factfinder. *See* Section 1302 of the RTKL, 65 P.S. § 67.1302.

7

preserved below. *Id.* at 477. *See also Payne v. Pa. Dep't of Health*, 240 A.3d 221, 225 n.6 (Pa. Cmwlth. 2020). Unlike in other administrative agency contexts, "we . . . may substitute our own findings of fact for that of the agency." *W. Chester Univ. of Pa. v. Browne*, 71 A.3d 1064, 1067 n.4 (Pa. Cmwlth. 2013). We have the discretion to conduct a hearing, or to remand to the OOR, to supplement the record. *Id.*

*Pa. Off. of Governor v. Brelje (Off. of Open Recs.)*, 312 A.3d 928, 932 (Pa. Cmwlth. 2024).

## A.    Specificity of the Request

We begin with the PLCB's assertion the Request lacked sufficient specificity. Section 703 of the RTKL states "[a] written request should identify or describe the records sought with sufficient specificity to enable the agency to ascertain which records are being requested." 65 P.S. § 67.703. Accordingly, "[t]he central question in evaluating the adequacy of a request is whether the request 'sufficiently informs an agency of the records requested.'" *Dep't of Corr. v. St. Hilaire*, 128 A.3d 859, 863 (Pa. Cmwlth. 2015) (quoting *Montgomery Cnty. v. Iverson*, 50 A.3d 281, 284 n.4 (Pa. Cmwlth. 2012)). When evaluating the specificity of a RTKL request, "this Court employs a three-part balancing test, examining the extent to which the request sets forth (1) the subject matter of the request; (2) the scope of documents sought; and (3) the timeframe for which records are sought." *Pa. Dep't of Educ. v. Pittsburgh Post-Gazette*, 119 A.3d 1121, 1124 (Pa. Cmwlth. 2015) (citation omitted). None of these factors are dispositive, however, and we employ a "flexible, case by case, contextual application of the test." *Off. of Dist. Att'y of Phila. v. Bagwell*, 155 A.3d 1119, 1145 (Pa. Cmwlth. 2017).

We have further explained that "[t]he subject matter of the request must identify the 'transaction or activity' of the agency for which the record is sought." *Id.* at 1125 (quoting Section 102 of the RTKL, 65 P.S. § 67.102). Further, the

8

"subject matter should provide a context to narrow the [agency's] search." *Pittsburgh Post-Gazette*, 119 A.3d at 1125 (citations omitted). "The scope of the request must identify 'a discrete group of documents, either by type . . . or by recipient.'" *Id.* (citation omitted). Finally, the "timeframe of the request should identify a finite period of time for which records are sought." *Id.* "The timeframe prong is, however, the most fluid of the three prongs, and whether or not the request's timeframe is narrow enough is generally dependent upon the specificity of the request's subject matter and scope." *Id.*

> With respect to the Request, the OOR concluded:

> The relevant timeframe is the year 2023, spanning 12 months. The scope of the Request is broad as it seeks, "[d]ocuments . . . ," and does not identify any discrete types of records. However, the Request does identify a discrete subject matter, generally concerning the delivery of bourbon whiskey to the stores in the specified counties.

> Here, the [PLCB] argues only that the Request is insufficiently specific because the fulfillment of the Request would likely create an undue burden on the [PLCB]. However, the Request identifies a subject matter and a specific transaction of activity of the [PLCB], as delivery of alcohol is under the purview of the [PLCB].

> In [*Bagwell*], the Commonwealth Court stated that an open-ended request that fails to give an agency guidance in its search may be so burdensome that the request will be found overbroad under the RTKL. 155 A.3d [at 1143]; *see also* [*Iverson*], 50 A.3d [at] 283 ("[a]n open-ended request that gives an agency little guidance regarding what to look for may be so burdensome that it will be considered overly broad"); *Keystone Nursing & Rehab of Reading, LLC v. Simmons-Ritchie*, 22 A.3d 1226 (Pa. [Cmwlth.] 2020) (burdensome nature of the search and likely volume of exempt records to review should be considered when making a specificity determination). However, while burden may be a factor in determining that a request is insufficiently specific, the fact that a request is burdensome does not, in and of itself, deem it overbroad. *See Pa. Dep't of [Env't] Prot. v. Legere*, 50 A.3d 260, 265 (Pa. [Cmwlth.] 2012) ("The fact that a request is burdensome does not deem it overbroad") . . . .

9

. . . .

> Here, . . . the Request . . . does identify a subject matter, a transaction or activity of the [PLCB], and further, identifies the specific goods or services, and pinpoints specific counties to allow the [PLCB] to ascertain what records are being requested. Further, the Commonwealth Court has noted that "the specificity of a request must be construed in the request's context, rather than envisioning everything the request might conceivably encompass." *Iverson*, 50 A.3d at 284 . . . . Accordingly, the OOR finds that this portion of the Request is sufficiently specific.

R.R. at 258a-60a. The PLCB argues the OOR erred because the Request "(1) failed to identify specific 'bourbon whiskeys;' (2) failed to identify the types of records it sought; and (3) the 2023 timeframe was extraordinarily broad." PLCB Br. at 33. We disagree.

As the OOR properly concluded, the Request is limited to a 12-month timeframe and has a very discrete subject matter and scope (documents identifying bourbon whiskey deliveries, with dates, to stores in four specific counties). On balance, the Request sufficiently informs the PLCB of the records requested. *See St. Hilaire*, 128 A.3d at 863. As a result, we agree with the OOR's analysis and conclude the Request is sufficiently specific under Section 703 of the RTKL.

## B. Personal Safety Exemption

Next, we turn to Requester's assertion the OOR erred in determining the requested records were exempt under the personal safety exemption. "A record in the possession of a Commonwealth agency . . . shall be presumed to be a public record" unless it is exempt under Section 708 of the RTKL, is protected by a privilege, or is exempt under other Federal or State laws, regulations, or judicial orders or decrees. *See* Section 305(a) of the RTKL, 65 P.S. § 67.305(a). If a Commonwealth agency asserts an exemption under Section 708 of the RTKL, the

10

Commonwealth agency bears the burden of proving, by a preponderance of the evidence, the record is exempt. *See* Section 708(a)(1) of the RTKL, 65 P.S. § 67.708(a)(1). "A preponderance of the evidence is such evidence as would lead a fact-finder to find that the existence of a contested fact is more probable than the nonexistence of the contested fact." *Bagwell*, 155 A.3d at 1130 (citations omitted).

Section 708(b)(1)(ii) of the RTKL provides a record is exempt from disclosure if the record's disclosure "would be reasonably likely to result in a substantial and demonstrable risk of physical harm to or the personal security of an individual." 65 P.S. § 67.708(b)(1)(ii). To prove an entitlement to this exemption, an agency must show both: (1) a "reasonable likelihood" of (2) "substantial and demonstrable risk" to an individual's security if the information is not protected. *Governor's Off. of Admin. v. Purcell*, 35 A.3d 811 (Pa. Cmwlth. 2011). The agency must "offer more than speculation or conjecture." *Cal. Borough v. Rothey*, 184 A.3d 456, 468 (Pa. Cmwlth. 2018).

Here, the Attestations primarily outlined annoyances and inconveniences employees at the PLCB's FW&GS stores faced from bourbon whiskey enthusiasts camping out at stores in anticipation of limited release shipments and contacting stores to obtain information on those shipments. While the Schaul Attestation attempted to paint these actions as harassment, the examples he provided included bourbon whiskey enthusiasts bringing lawn chairs to camp outside stores, loitering, calling the stores, emailing the stores, and purchasing products. None of these activities constitute a substantial and demonstrable risk to an individual's safety. Instead, the portions of the Attestations that purported to address safety concerns

11

were either anecdotal, lacked sufficient details to adequately connect them with the requested records, or were not based upon personal observations.

Through the Attestations, the PLCB showed that Pennsylvania's bourbon whiskey enthusiasts have a strong desire to *lawfully purchase* bourbon whiskey at the PLCB's FW&GS stores, causing annoyance and inconvenience. With regard to a "risk of physical harm to or the personal security of an individual," however, as required by 65 P.S. § 67.708(b)(1)(ii), the Attestations offered mere speculation. *See Rothey*, 184 A.3d at 468. Therefore, we conclude the PLCB failed to meet its burden of establishing the requested records are exempt from disclosure under the personal safety exemption.

## C. Additional Exemptions

The PLCB also argues the requested records are exempt from disclosure under Section 708(b)(3) and (11) of the RTKL, 65 P.S. § 67.708(b)(3) and (11). Section 708(b)(3) of the RTKL exempts from disclosure:

> A record, the disclosure of which creates a reasonable likelihood of endangering the safety or the physical security of a building, public utility, resource, infrastructure, facility or information storage system, which may include:
>
> > (i) documents or data relating to computer hardware, source files, software and system networks that could jeopardize computer security by exposing a vulnerability in preventing, protecting against, mitigating or responding to a terrorist act;
> >
> > (ii) lists of infrastructure, resources and significant special events, including those defined by the Federal Government in the National Infrastructure Protections, which are deemed critical due to their nature and which result from risk analysis; threat assessments; consequences assessments; antiterrorism protective measures and plans; counterterrorism measures and plans; and security and response needs assessments; and

12

(iii) building plans or infrastructure records that expose or create vulnerability through disclosure of the location, configuration or security of critical systems, including public utility systems, structural elements, technology, communication, electrical, fire suppression, ventilation, water, wastewater, sewage and gas systems.

65 P.S. § 67.708(b)(3). Section 708(b)(11) of the RTKL exempts from disclosure "[a] record that constitutes or reveals a trade secret or confidential proprietary information." 65 P.S. § 67.708(b)(11).

With respect to Section 708(b)(3) of the RTKL, the PLCB argues the Attestations support a conclusion the release of the requested records "would create a reasonable likelihood of endangering the safety or physical security of a building, public utility, resource, infrastructure, facility, or information system." *See* PLCB Br. at 23. The PLCB asserts its evidence in support of the personal safety exemption also supports this exemption.

For the same reasons we concluded the PLCB's evidence was speculative with respect to the personal safety exemption, we likewise conclude the PLCB's evidence was speculative with respect to Section 708(b)(3) of the RTKL. As outlined above, the PLCB established that some groups of bourbon whiskey enthusiasts actively pursued shipments of bourbon whiskey to the PLCB's FW&GS stores for the purpose of purchasing limited release bourbon whiskey. The PLCB's evidence regarding potential thefts was purely speculative and does not show a reasonable likelihood of endangerment to the safety or physical security of the PLCB's infrastructure.

With respect to Section 708(b)(11) of the RTKL, the PLCB argues the Attestations support a conclusion the release of the requested records would reveal a trade secret or confidential proprietary information, *see* 65 P.S. § 67.708(b)(11),

because making its delivery schedules matters of public record "would lead to consumers pursuing these products ahead of release and cause unfair competition in the market." *See* PLCB Br. at 27. Section 102 of the RTKL defines a "trade secret" as:

> Information, including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:
>
> > (1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> >
> > (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> The term includes data processing software obtained by an agency under a licensing agreement prohibiting disclosure.

65 P.S. § 67.102. Bourbon whiskey does not derive independent economic value in Pennsylvania based upon where and when it is delivered to the PLCB's FW&GS stores. As a result, the requested records do not fall under the RTKL's definition of a trade secret.

> Section 102 of the RTKL defines "confidential proprietary information" as:
>
> Commercial or financial information received by an agency:
>
> > (1) which is privileged or confidential; and
> >
> > (2) the disclosure of which would cause substantial harm to the competitive position of the person that submitted the information.

*Id.* First, the PLCB did not receive information about its delivery schedule of bourbon whiskey. Instead, it establishes these schedules. Therefore, no person

14

submitted the delivery dates to the PLCB, and no person is at risk of having its competitive position harmed. Second, the PLCB controls all liquor sales in Pennsylvania. So even if we considered the PLCB's competitive position, it does not have any in-state competition. For these reasons, the requested records do not fall under the RTKL's definition of confidential proprietary information. Accordingly, the PLCB has failed to prove the requested records qualify for an exemption under Section 708(b)(11) of the RTKL.

## D. Counsel Fees

In Requester's Application, Requester asserts the PLCB's decision to attach materials to its brief which are not in the certified record caused Requester to expend legal fees in filing a motion to exclude those materials. Specifically, Requester asserts the PLCB "attempted to unilaterally and improperly supplement the record before this Court without leave to do so, hoping that [Requester] would not notice or otherwise take appropriate action in response thereto." *See* Application, 10/23/24, ¶ 5. Similarly, Requester asserts the PLCB did not file a response to Requester's Application to Strike these materials because the PLCB knew "its conduct was wholly improper." *Id.* ¶ 7. The PLCB expressly denied these allegations in its Answer to the Application. *See* PLCB Response, 11/12/24, ¶¶ 5, 7.

Pennsylvania Rule of Appellate Procedure 2744 permits an appellate court to award counsel fees when a party's conduct is "dilatory, obdurate or vexatious." Pa.R.A.P. 2744. Requester concedes in the Application that vexatious conduct is conduct which lacks "reasonable or probable cause or excuse," or is harassing or annoying. *See Cnty. of Fulton v. Sec'y of Commonwealth*, 292 A.3d 974, 1014 (Pa. 2023). Requester has not provided any evidence of an ill motive on the part of the PLCB, and the PLCB's Answer to the Application reveals a reasonable cause for the

15

PLCB's actions (an attempt to include publicly available information). Although erroneous, we cannot conclude the PLCB's inclusion of these materials constituted vexatious conduct. Therefore, we deny the Application.

### IV.    Conclusion

For the reasons set forth above, we conclude the Request was sufficiently specific and the PLCB did not carry its burden of proving the requested records are exempt from disclosure under Section 708(b)(1), (3), or (11) of the RTKL, 65 P.S. § 67.708(b)(1), (3), and (11). Accordingly, we reverse the OOR's Final Determination and direct the PLCB to produce the requested records. In addition, we deny Requester's Application.

<br>

_____
STACY WALLACE, Judge

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Benjamin R. Picker,     :
      Petitioner :
           :
  v.       : No. 553 C.D. 2024
           :
Pennsylvania Liquor Control Board :
(Office of Open Records),    :
     Respondent :

# **O R D E R**

**AND NOW**, this 8th day of January 2025, the April 24, 2024 Final Determination of the Pennsylvania Office of Open Records is **REVERSED**. The Pennsylvania Liquor Control Board is hereby directed to produce the records responsive to the December 14, 2023 request submitted by Benjamin R. Picker (Petitioner) pursuant to the Right-to-Know Law, Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104, within 60 days of the date of this Order.

In addition, Petitioner's Interim Application for Counsel Fees is **DENIED**.

          _____
          STACY WALLACE, Judge